IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

Roger Williams,                           )
                                          )        C.A. No.  9:22-03555-HMH
                          Petitioner,     )
                                          )
        vs.                               )        **OPINION & ORDER**
                                          )
Warden Shane Jackson, Warden of Lee       )
Correctional Institution,                 )
                                          )
                          Respondent.     )

This matter is before the court for review of the report and recommendation of United

States Magistrate Judge Molly H. Cherry made in accordance with 28 U.S.C. § 636(b)(1) and

Local Civil Rule 73.02 for the District of South Carolina.[1]  Petitioner Roger A. Williams

("Williams"), a state prisoner, seeks habeas corpus relief under 28 U.S.C. § 2254.  In her report

and recommendation, Magistrate Judge Cherry recommends granting Respondent's motion for

summary judgment and denying Williams's petition.  For the reasons below, the court adopts

the report and recommendation, grants Respondent's motion for summary judgment, and denies

Williams's petition.

---

[1] The recommendation has no presumptive weight, and the responsibility for making a
final determination remains with the United States District Court.  See Mathews v. Weber, 423
U.S. 261, 270 (1976).  The court is charged with making a de novo determination of those
portions of the report and recommendation to which specific objection is made.  The court may
accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge
or recommit the matter with instructions.  28 U.S.C. § 636(b)(1).

## I. FACTUAL AND PROCEDURAL BACKGROUND

In September 2010, a Berkeley County grand jury indicted Williams for homicide by child abuse and unlawful conduct towards a child for the death of his two-year-old son ("Victim"). (Return Attach. 1 (App'x Vol. 2 at 21-22, 25-26), ECF No. 10-4.) Two months later, Williams was indicted for destruction or desecration of human remains. (Id. Attach. 3, ECF No. 10-11.) Williams pleaded guilty to desecration of human remains in September 2012 and proceeded to trial on the remaining charges. (Id. Attach. 1 (App'x. Vol. 2 at 145-153), ECF No. 10-4.)

Williams's trial took place in October 2012. The State's primary witness was Williams's ex-girlfriend, Grace Trotman ("Trotman"). Trotman and Williams were romantically involved from 2006 to 2010 and had two children together during that time. (Id. Attach. 1 (App'x Vol. 1 at 192-99), ECF No. 10-1.) In 2009, after the birth of their first child, the couple discovered that Williams had fathered Victim with another woman in 2007. (Id. Attach. 1 (App'x Vol. 1 at 202), ECF No. 10-1); (Return Attach. 1 (App'x Vol. 1 at 75), ECF No. 10-2.)

In May 2010, Williams and Victim's mother arranged for Victim to spend the summer with Williams and Trotman. (Id. Attach. 1 (App'x Vol. 1 at 82-83), ECF No. 10-2.) Williams's relationship with Victim was "really good in the beginning," according to Trotman. (Id. Attach. 1 (App'x Vol. 1 at 211-12), ECF No. 10-1.) Williams, however, soon became concerned that Victim was "act[ing] more feminine." (Id. Attach. 1 (App'x Vol. 1 at 214), ECF No. 10-1.) Williams specifically did not like that Victim stood "like a girl," "[w]ith his hip out to the side." (Id. Attach. 1 (App'x Vol. 1 at 214-15), ECF No. 10-1.) Trotman testified that Williams would

2

call Victim a "faggot" and thought that he "couldn't defend himself." (Return Attach. 1 (App'x Vol. 1 at 213-14), ECF No. 10-1.) To get Victim to "toughen up," Williams made the couple's minor daughter slap, scratch, and drag Victim around the house. (Id. Attach. 1 (App'x Vol. 1 at 212), ECF No. 10-1.) Ultimately, Williams started hitting Victim himself.

"In the beginning," Trotman testified, Williams "would just kinda paddle and like pop him on his arm." (Id. Attach. 1 (App'x Vol. 1 at 232), ECF No. 10-1.) Williams progressed to striking Victim's back and chest with a closed fist and "slap[ping] his head to the floor." (Id. Attach. 1 (App'x Vol. 1 at 232), ECF No. 10-1.) A week before Victim's death, Trotman witnessed Victim suffer a seizure after Williams "boxed him in his back." (Id. Attach. 1 (App'x Vol. 1 at 217), ECF No. 10-1.) Trotman stated that Victim "started grunting" and that something "weird" happened with his eyes before he went limp and temporarily lost consciousness. (Return Attach. 1 (App'x Vol. 1 at 217-18), ECF No. 10-1.)

A few days later, on June 6, Williams became angry with Victim because he "had poop on the back of his pants" and the floor of his bedroom. (Id. Attach. 1 (App'x Vol. 1 at 221), ECF No. 10-1.) Trotman testified that she stayed in the living room as Williams took Victim into his bedroom and repeatedly "hit[] him against the wall." (Id. Attach. 1 (App'x Vol. 1 at 225), ECF No. 10-1.) When Trotman entered the bedroom to check on Victim, she saw him "sitting on the wall like he was in a daze." (Id. Attach. 1 (App'x Vol. 1 at 226), ECF No. 10-1.) Trotman left the room after Williams told her that Victim was "fine" and to "just leave him alone." (Id. Attach. 1 (App'x Vol. 1 at 226), ECF No. 10-1.)

The next morning, June 7, Trotman was breastfeeding her son when Victim and the couple's daughter started fighting. (Return Attach. 1 (App'x Vol. 1 at 227), ECF No. 10-1.)

3

After the children ignored Trotman's command to stop, Trotman "popped" both of them on the arm. (Id. Attach. 1 (App'x Vol. 1 at 227), ECF No. 10-1.) Upon being hit, Victim "fell to his bottom, lost balance[,] and hit his head on the wall." (Id. Attach. 1 (App'x Vol. 1 at 228), ECF No. 10-1.) Noticing that Victim was "acting different . . . like [he was] gasping for air," Trotman tried to perform CPR on Victim. (Id. Attach. 1 (App'x Vol. 1 at 230), ECF No. 10-1.) Victim still had a pulse, so Trotman ran outside to use her neighbor's phone. (Id. Attach. 1 (App'x Vol. 1 at 232-33), ECF No. 10-1.) Rather than call emergency services, however, Trotman called Williams at work. (Return Attach. 1 (App'x Vol. 1 at 233), ECF No. 10-1.) Williams told her not to call 911 or "say anything" and to "wait until he got home." (Id. Attach. 1 (App'x Vol. 1 at 233-34), ECF No. 10-1.) Trotman then ran to another neighbor's house where she called Williams a second time. (Id. Attach. 1 (App'x Vol. 1 at 234-35), ECF No. 10-1.) He again instructed her not to call an ambulance and to wait for him to return home. (Id. Attach. 1 (App'x Vol. 1 at 235), ECF No. 10-1.) During the time Trotman waited for Williams, she did not check on Victim and instead remained outside with the neighbor's cell phone. (Id. Attach. 1 (App'x Vol. 1 at 235), ECF No. 10-1.)

Williams eventually returned home after receiving a ride from a friend. He proceeded inside the home with Trotman, touched Victim's chest, and stated, "That boy dead." (Return Attach. 1 (App'x Vol. 1 at 236), ECF No. 10-1.) According to Trotman, Williams immediately began devising a plan to dispose of Victim's body. (Id. Attach. 1 (App'x Vol. 1 at 235-36), ECF No. 10-1.) Williams went to a hardware store and bought a large trash can and cement. (Id. Attach. 1 (App'x Vol. 1 at 237), ECF No. 10-1.) He then removed Victim's clothes, wiped

the body down with peroxide – "[s]o he wouldn't have any of his fingerprints on him" – took the body to the garage, and wrapped it in trash bags and duct tape. (Id. Attach. 1 (App'x Vol. 1 at 237-38), ECF No. 10-1.) After wrapping the body, Williams mixed the cement in the trash can and put Victim's body in headfirst. (Id. Attach. 1 (App'x Vol. 1 at 238), ECF No. 10-1.) When he realized he did not have enough cement, Williams called a friend to bring him more cement, which he used to fill the rest of the trash can. (Return Attach. 1 (App'x Vol. 1 at 238), ECF No. 10-1.)

The next day, Williams and Trotman loaded the trash can onto a rented truck and drove "towards Orangeburg," looking for a place to dump Victim's body. (Id. Attach. 1 (App'x Vol. 1 at 239-40), ECF No. 10-1.) Unable to find a suitable location, they drove home with the trash can, unloaded it, and returned the rented truck. (Id. Attach. 1 (App'x Vol. 1 at 240), ECF No. 10-1.) The couple rented another truck a day later and again drove "out there to Orangeburg" after Williams finished work for the day. (Id. Attach. 1 (App'x Vol. 1 at 242), ECF No. 10-1.) They "r[o]de around for a while" before Williams instructed Trotman to pull behind an abandoned trailer. (Id. Attach. 1 (App'x Vol. 1 at 242-43), ECF No. 10-1.) Trotman waited in the truck as Williams "rolled the trash can off the truck" into the woods. (Return Attach. 1 (App'x Vol. 1 at 243), ECF No. 10-1.)

About a month later, Victim's mother requested to visit her son. (Id. Attach. 1 (App'x Vol. 1 at 84), ECF No. 10-2.) Trotman and Williams – who had repeatedly fabricated reasons as to why Victim was unavailable – concocted an elaborate plan to stage Victim's disappearance over the July Fourth weekend. (Id. Attach. 1 (App'x Vol. 1 at 247-51), ECF No. 10-1.) Trotman, however, eventually confessed to law enforcement and led them to where Victim's

body was located.  (<u>Id.</u> Attach. 1 (App'x Vol. 1 at 1-6), ECF No. 10-2.)

After hearing three days of testimony from Trotman and other witnesses, the jury found Williams guilty of both charges.  (<u>Id.</u> Attach. 1 (App'x Vol. 2 at 4-5), ECF No. 10-4.)  The court sentenced him to life imprisonment without the possibility of parole for homicide by child abuse and ten years' imprisonment each for unlawful conduct towards a child and desecration of human remains, with all sentences to run concurrently.  (Return Attach. 1 (App'x Vol. 2 at 16-17), ECF No. 10-4.)  Williams timely filed a direct appeal, which he later withdrew and the South Carolina Court of Appeals dismissed in October 2014.  (<u>Id.</u> Attach. 1 (App'x Vol. 3 at 77), ECF No. 10-7.)

Following his conviction and unsuccessful direct appeal, Williams filed a pro se application for post conviction relief ("PCR") in August 2015.  (<u>Id.</u> Attach. 1 (App'x Vol. 3 at 80-86), ECF No. 10-7.)  Williams later obtained counsel and amended his application in May 2018.  (<u>Id.</u> Attach. 1 (App'x Vol. 3 at 87-94), ECF No. 10-7.)  In his amended application, Williams raised thirteen claims of ineffective assistance of trial counsel.  The PCR court held an evidentiary hearing in May 2018 and ultimately denied Williams's application in December 2018.  (<u>Id.</u> Attach. 1 (App'x Vol. 3 at 28-61), ECF No. 10-8); (Return Attach. 1 (App'x Vol. 4 at 2-13), ECF No. 10-9.)  Williams's subsequent motion to reconsider was also denied. (<u>Id.</u> Attach. 1 (App'x Vol. 4 at 29-33), ECF No. 10-9.)

Williams thereafter petitioned the South Carolina Supreme Court for a writ of certiorari. (<u>Id.</u> Attach. 6, ECF No. 10-14.)  The supreme court transferred Williams's petition to the South Carolina Court of Appeals, which denied certiorari in June 2022.  (<u>Id.</u> Attach. 9, ECF No. 10-17); (<u>Id.</u> Attach. 10, ECF No. 10-18.)  The court of appeals also denied Williams's petition

6

for rehearing.  (Return Attach 12, ECF No. 10-20.)

On October 13, 2022, Williams filed the instant habeas petition, raising four grounds for

relief:

> **Ground One:** Trial counsel was constitutionally ineffective when he failed to object to Grace Trotman, co-defendant, testifying that Mr. Williams did not believe in God or Jesus.

> **Ground Two:** Trial counsel was constitutionally ineffective when he failed to object to the co-defendant testifying that Mr. Williams was racially prejudiced.

> **Ground Three:** Trial counsel was constitutionally ineffective in failing to ask for a directed verdict on the failure to render medical aid on the homicide by child abuse charge.

> **Ground Four:** Trial counsel was constitutionally ineffective when he failed to move to quash the vague indictment in this case.

(See generally § 2254 Pet., ECF No. 1.)

On December 16, 2022, Respondent moved for summary judgment.  (Mot. Summ. J.,

ECF No. 11.)  Williams responded in opposition on January 19, 2023.  (Resp. Opp'n, ECF

No. 14.)  On February 23, 2023, Magistrate Judge Cherry issued her report and

recommendation.  (R&R, ECF No. 15.)  Magistrate Judge Cherry recommended granting

Respondent's motion for summary judgment and denying Williams's petition because he has not

shown that the PCR court's application of Strickland v. Washington, 466 U.S. 668 (1984), was

objectively unreasonable.  (See generally id., ECF No. 15.)  Williams timely filed objections to

the report and recommendation on March 30, 2023.  (Objs., ECF No. 21.)  This matter is now

ripe for review.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The court views "all facts and reasonable inferences in the light most favorable to the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does so, the burden shifts to the nonmoving party to "go beyond the pleadings" and come forward with "specific facts showing that there is a genuine issue for trial." Id. at 324. Under this standard, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).

### B. Habeas Relief Under 28 U.S.C. § 2254

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court may consider a state prisoner's habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

8

To obtain habeas relief under the AEDPA, a petitioner must show that the PCR court's ruling

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). Stated another way, the petitioner must show that the decision was "diametrically different, opposite in character or nature, or mutually opposed" to a prior Supreme Court decision. Williams v. Taylor, 529 U.S. 362, 405 (2000) (internal quotation marks omitted).

A state-court decision involves "unreasonable application" of clearly established federal law when "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the [petitioner's] case." Bell, 535 U.S. at 694. A reviewing federal court cannot grant habeas relief simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411. Thus, if "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA. Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted).

9

Finally, for a state court's factual determination to be unreasonable, "it must be more than merely incorrect or erroneous" – it must be "sufficiently against the weight of the evidence that it is objectively unreasonable." Williams v. Stirling, 914 F.3d 302, 312 (4th Cir. 2019). The AEDPA instructs that the state court's factual determinations are "presumed to be correct" and may be overturned only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### C. Ineffective Assistance of Counsel

For ineffective-assistance-of-counsel claims, the "clearly established Federal law" is Strickland v. Washington, 466 U.S. 668 (1984). To prevail under Strickland, the petitioner must show (1) that his counsel's representation was deficient and (2) that he was prejudiced as a result. Id. at 687. The first prong requires a showing that counsel's performance "fell below an objective standard of reasonableness" under "prevailing professional norms." Id. at 688. For the second prong, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

When a § 2254 petition raises ineffective assistance of counsel as a ground for relief, review is "doubly" deferential: "[T]he question is not whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105 (emphasis added). This doubly deferential standard requires that the court give "both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. 12, 15 (2013). Practically speaking, "a federal court may grant relief only if every 'fairminded juris[t]' would agree that every reasonable lawyer would have made a different decision." Dunn v. Reeves, 141 S. Ct. 2405, 2411 (2021) (emphasis in original).

### III. DISCUSSION

Williams objects to the magistrate judge's report and recommendation on four grounds.[2] He argues that the magistrate judge incorrectly found that the PCR court reasonably applied Strickland in concluding that his trial counsel was not ineffective for failing to: (1) object to Trotman's testimony that Williams did not believe in God, (2) object to Trotman's testimony suggesting that Williams was racially prejudiced, (3) move for a directed verdict on whether Williams failed to render medical aid, and (4) move to quash Williams's indictment.

### A. Objections One and Two

In his first two objections, Williams argues that trial counsel was ineffective for not objecting to the following testimony by Trotman:

| | |
|---|---|
| Q. | What kind of child was [Victim]? |
| A. | Very happy.  He liked to sing, he always - - - |
| Q. | What would he sing? |
| A. | Church songs he learned in school. |
| Q. | Do you know if [Williams] had an opinion that he expressed to you about those songs? |
| A. | Yes, he didn't let him sing the songs. |
| Q. | Why not? |
| A. | **Because he was like - - he want to - - he didn't believe in God.  I mean, he didn't believe in Jesus and so he didn't want his son singing songs like that.** |
| Q. | How did he get [Victim] to stop singing the songs? |
| A. | Eventually he stopped on his own. |
| Q. | And what about his school, did [Victim] go to school? |
| A. | Yes. |
| Q. | Did he go to school when he lived with y'all? |
| A. | No, ma'am. |

---

[2] Objections to a report and recommendation must be specific.  The failure to file specific objections waives a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge.  See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984).  In the absence of specific objections, this court need not give any explanation for adopting the magistrate judge's report and recommendation.  See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

> Q.  Did [Williams] tell you what he thought about the school?
> A.  **He didn't want him to go to school. He felt like he was going to teach him what he needed to know. He didn't want white people to teach his kids.**
> Q.  He didn't want white people to teach his kids?
> A.  Yes.
> Q.  Was he planning on home schooling?
> A.  No.
> Q.  What was he going to do?
> A.  I have no clue.

(Return Attach. 1 (App'x Vol. 1 at 204-05), ECF No. 10-1) (emphasis added).

During the PCR hearing, trial counsel stated that his general defense strategy was to show that, although Williams participated in covering up Victim's death, Trotman was liable for killing Victim, as she delivered the final, fatal blow. (Id. Attach. 1 (App'x Vol. 3 at 102-03), ECF No. 10-7.) As for the above testimony, trial counsel stated that he had no reason to believe that Trotman would mention race or religion on the stand based on his pretrial interviews with her. (Id. Attach. 1 (App'x Vol. 3 at 110-11), ECF No. 10-7.) Trial counsel offered the following explanation for why he did not object:

> A.  Okay. Well, my theory here was that the worst thing - - clearly, I wasn't anticipating that response, and I really did think that that was the worst thing that they were going to hear, but **I certainly didn't want to remind the jury again and again bringing it up in objections and highlighting it. I was hoping it would sort of play through it.** Obviously, it reads worse than the transcript does, if you're listening from the jury box.
> Q.  One of those things that the more you mention it, the worse it gets?
> A.  Yes.
> Q.  So the theory, while you didn't like it - -
> A.  I can't tell you that was my theory, but if that happened today, that would be my theory, and I'm assuming that's what happened then.

(Id. Attach. 1 (App'x Vol. 3 at 111-13), ECF No. 10-7) (emphasis added).

Applying Strickland, the PCR court held that trial counsel did not render ineffective assistance by failing to object to either statement. First, the PCR court found that trial counsel's

performance was not deficient, as he "employed a valid strategic decision in not objecting" –

that is, he did not want to highlight Williams's religious views and alleged racial prejudices to

the jury.  (Id. Attach. 1 (App'x Vol. 4 at 9, 10), ECF No. 10-9.)  Next, the PCR court found that

Williams had not shown any resulting prejudice.  Williams's religious and racial views were not

mentioned again during the trial, and there was ample evidence from which the jury could

convict him.  (Return Attach. 1 (App'x Vol. 4 at 9, 10), ECF No. 10-9.)  Thus, the court

concluded, "It is unlikely such . . . innocuous comment[s] . . . would have affected the outcome

of the trial."  (Id. Attach. 1 (App'x Vol. at 9), ECF No. 10-9.)

The PCR court's application of Strickland was not unreasonable.  In evaluating an

ineffective-assistance claim, courts must "indulge a strong presumption that counsel's conduct

[fell] within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.

The PCR court properly credited trial counsel's testimony that he made a strategic decision not

to object to Trotman's statements because he did not want to draw the jury's attention to them.

Williams resists this conclusion, arguing that, under South Carolina law, counsel may not

refrain from objecting merely "because he [does] not want to confuse or upset the jury."

Dawkins v. State, 551 S.E.2d 260, 263 (S.C. 2001), overruling on other grounds recognized by

Thompson v. State, 814 S.E.2d 487 (S.C. 2018).  Here, however, trial counsel was not trying to

avoid confusing or upsetting the jury; he was hoping the jury would ignore Trotman's passing

statements about Williams's religious views and racial prejudices altogether.  Thus, Dawkins is

inapplicable.

Williams also argues that the PCR court unreasonably applied Strickland because trial

counsel could not conclusively remember his strategy at the PCR hearing.  (See  Return Attach.

1 (App'x Vol. 3 at 111-12), ECF No. 10-7) ("I can't tell you that was my theory, but if that

happened today, that would be my theory, and I'm assuming that's what happened then.")  That

argument, however, ignores that it is Williams's burden, as the petitioner, to rebut the "strong

presumption" that trial counsel employed sound trial strategy in not objecting.  Titlow, 571

U.S. at 23 ("It should go without saying that the absence of evidence cannot overcome the

'strong presumption that counsel's conduct [fell] within the wide range of reasonable

professional assistance.'" (quoting Strickland, 466 U.S. at 689)); see also Greiner v. Wells,

417 F.3d 305, 326 (2d Cir. 2005) ("[Counsel's] inability to remember his reasons for conducting

the trial in the manner that he did . . . is insufficient evidence to overcome the presumption of

constitutionally effective counsel sustained by the record justification for [his] actions.");

Sallahdin v. Mullin, 380 F.3d 1242, 1251 (10th Cir. 2004) ("[G]iven the strong presumption of

reasonable professional assistance and the accompanying evidentiary burden imposed on [the

petitioner], we agree . . . that it is [the petitioner], rather than respondent, who must bear the

brunt of [counsel's] faulty memory and his ambiguous testimony.").  Because Williams has not

overcome that presumption, there is no basis for concluding that trial counsel was deficient in

failing to object to Trotman's testimony, let alone that the PCR court unreasonably applied

Strickland's deficiency prong.

The PCR court likewise did not unreasonably apply Strickland's second prong in holding

that Williams suffered no cognizable prejudice.  As the magistrate judge noted, the main issues

at trial were (1) whether Williams previously abused Victim, (2) whether Williams failed to

supply Victim with medical aid, and (3) whether Williams's abuse and/or failure to render aid

led to Victim's death.[3]  Besides Trotman's extensive testimony detailing Williams's abuse –

---

[3]  The jury was charged on both theories, and the verdict form did not require the jury to
specify the basis for its verdict.  (Return Attach. 1 (App'x Vol. 2 at 215-17), ECF No. 10-3)

and his directive not to call 911 the day Victim died – the jury heard testimony that Victim often

returned home with marks and bruises after staying with Williams, (Return Attach. 1 (App'x

Vol. 1 at 79), ECF No. 10-2), that his behavior changed after he began visiting Williams,

(Id. Attach. 1 (App'x Vol. 1 at 152-53), ECF No. 10-1), and that Williams had admitted to

"popp[ing]" Victim in the chest hard enough "to leave a bruise," (Id. Attach. 1 (App'x Vol. 1

at 198), ECF No. 10-2.)  Morever, Dr. Carol Jenny ("Dr. Jenny"), one of the State's experts,

opined that Victim likely died as the result of "repeated head injuries which led to his eventual

collapse."  (Id. Attach. 1 (App'x Vol. 2 at 10), ECF No. 10-3.)  Dr. Jenny based her conclusion

on the facts that Victim had suffered multiple concussions shortly before his death and his

autopsy revealed no subdural hematoma, meaning "there wasn't one major blow that led to his

demise."  (Id. Attach. 1 (App'x Vol. 2 at 16-17, 22-23), ECF No. 10-3.)  She also opined that

medical intervention likely would have prevented his death.  (Return Attach. 1 (App'x Vol. 2

at 19-20), ECF No. 10-3.)

Considering this evidence, the PCR court reasonably concluded that Williams had not

shown that the outcome of his trial would have been different had trial counsel objected to

Trotman's statements.  See Strickland, 466 U.S. at 700 ("Given the overwhelming aggravating

factors, there is no reasonable probability that the omitted evidence would have changed the

conclusion . . . ."); Id. at 696 ("[A] verdict or conclusion only weakly supported by the record is

more likely to have been affected by errors than one with overwhelming record support.").

The court therefore rejects Williams's first two objections.

_____

(jury charge); (Id. Attach. 1 (App'x Vol. 2 at 23, 27), ECF No. 10-4) (verdict form).

**B. Objection Three**

Williams next challenges the magistrate judge's determination that the PCR court reasonably held that trial counsel was not ineffective for failing to move for a directed verdict on whether Williams failed to render medical aid.

Williams's September 2010 indictment charged him with violating South Carolina's homicide by child abuse statute, S.C. Code Ann. § 16-3-85(A)(1).  The indictment alleged that Williams caused Victim's death "between the dates of 5-20-10 and 6-07-10 . . . while committing child abuse or neglect; and the death occurred under circumstances manifesting an extreme indifference to human life."  (Return Attach. 1 (App'x Vol. 2 at 22), ECF No. 10-4.)  Specifically, it alleged that Williams "inflict[ed], or allow[ed] to be inflicted by act or omission, harm on [Victim] . . . causing his death; and/or fail[ed] by act or omission to supply [Victim] with adequate health care causing harm resulting in his death."  (Id. Attach. 1 (App'x Vol. 2 at 22), ECF No. 10-4) (emphasis added).

At the end of the State's case-in-chief, trial counsel moved for a directed verdict.  Noting that Williams was not present when Victim died, trial counsel contended that the State had not presented sufficient "scientific proof" tying Williams to Victim's death.  (Id. Attach. 1 (App'x Vol. 2 at 62-64), ECF No. 10-3.)  The trial court denied the motion, observing that there was "an abundance of circumstantial evidence" linking Williams to Victim's prior injuries and explaining that Dr. Jenny's testimony "clearly would refute . . . any argument" that Victim's death was caused by a single blow.  (Id. Attach. 1 (App'x Vol. 2 at 64-65), ECF No. 10-3.)

On state collateral review, the PCR court found that trial counsel was not deficient because he made his "strongest argument" in moving for a directed verdict – "that there was no medical evidence linking [Williams] to Victim's death."  (Id. Attach. 1 (App'x Vol. 3 at 59-60),

ECF No. 10-8.)  The PCR court then found that Williams had not shown prejudice since it was

unlikely the trial court would have granted a directed verdict on the failure-to-render-aid issue.

(Return Attach. 1 (App'x Vol. 3 at 60), ECF No. 10-8.)

In reviewing the reasonableness of the PCR court's decision, the court need only address

the prejudice prong.  Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an

ineffective assistance claim . . . to address both components of the inquiry if the defendant

makes an insufficient showing on one.")  At trial, the State presented evidence showing that

Williams not only repeatedly abused Victim, but failed to seek medical aid each time Victim

suffered a seizure.  (Return Attach. 1 (App'x Vol. 1 at 216-19, 225-26, 231-32), ECF No. 10-1.)

The State also showed that Williams failed to render aid the day Victim died, as Williams twice

instructed Trotman not to call 911.  (Id. Attach. 1 (App'x Vol. 1 at 233-35), ECF No. 10-1);

(Id. Attach. 1 (App'x Vol. 1 at 55-56), ECF No. 10-2.)   Further, in ruling on the directed

verdict, the trial court highlighted Williams's own admission:

> [T]here is a statement in the defendant's own statement, and I wrote it down because
> if it [were] a civil trial, I'd have to direct a verdict based on the statement alone,
> nothing else.  "We didn't call the ambulance, that makes us both responsible."
> Precisely, absolutely, succinctly states what the statu[t]e says.  **His own statement
> makes him guilty of this offense, if the jury believes that.  Because that is
> exactly what happened.  They didn't do anything.**

(Id. Attach 1 (App'x Vol. 2 at 65), ECF No. 10-3) (emphasis added).

In light of the trial court's ruling, the PCR court reasonably concluded that trial counsel

would not have been successful in moving for a directed verdict on the failure-to-render-aid

issue.  See Strickland, 466 U.S. at 694 (requiring a petitioner to show "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.").  Thus, the court rejects Williams's third objection.

17

## C. Objection Four

In his final objection, Williams argues that trial counsel rendered ineffective assistance

by not moving to quash the indictment for homicide by child abuse.  The indictment charged

> [t]hat Roger Williams did in Berkeley County on or between the dates of 5-20-10 and 6-07-10 cause the death of a child under the age of eleven while committing child abuse or neglect; and the death occurred under circumstances manifesting an extreme indifference to human life. This is in violation of 16-3-85 A (1)[.]

> To Wit: Inflicting, or allowing to be inflicted by act or omission, harm on [Victim] . . . causing his death; and/or failing by act or omission to supply [Victim] with adequate health care causing harm resulting in his death.

(Return Attach. 1 (App'x Vol. 2 at 22), ECF No. 10-4.)  For comparison, South Carolina's

homicide by child abuse statute reads:

> (A) A person is guilty of homicide by child abuse if the person:

> > (1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life[.]

> . . . .

> (B) For purposes of this section, the following definitions apply:

> > (1) "child abuse or neglect" means an act or omission by any person which causes harm to the child's physical health or welfare;

> > (2) "harm" to a child's health or welfare occurs when a person:

> > > (a) inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment; [or]

> > > (b) fails to supply the child with adequate . . . health care, and the failure to do so causes a physical injury or condition resulting in death[.]

S.C. Code Ann. § 16-3-85.

At the PCR hearing, trial counsel testified that, although the indictment did not specify "what Mr. Williams really did," he was "on notice of what the State expected to prove because" he had reviewed about "3000 pages of discovery."  (Return Attach. 1 (App'x Vol. 3 at 130-31), ECF No. 10-7.)  One of the State's solicitors confirmed that trial counsel had "painstakingly" reviewed discovery with the prosecution "for about six hours" and had "drilled Dr. Jenny with questions about what she was going to testify about."  (Id. Attach. 1 (App'x Vol. 3 at 187, 193), ECF No. 10-7) ("We went through the evidence painstakingly, page by page, Bates stamp by Bates stamp.")

Citing South Carolina law, the PCR court found that the indictment "stated with sufficient certainty and particularity" the offense with which Williams was charged and "clearly apprised" him of the offense's elements.  (Id. Attach. 1 (App'x Vol. 4 at 6-7), ECF No. 10-9); see State v. Reddick, 560 S.E.2d 441, 443 (S.C. Ct. App. 2002) ("An indictment passes legal muster if it 'charges the crime substantially in the language of the . . . statute prohibiting the crime or so plainly that the nature of the offense charged may be easily understood . . . .'" (quoting S.C. Code Ann. § 17-19-20)).  The PCR court then concluded that Williams failed to show deficiency or prejudice because trial counsel knew the offense with which Williams was charged, the elements of that offense, and the evidence against him.  (Return Attach. 1 (App'x Vol. 4 at 7-8), ECF No. 10-9.)

The PCR court reasonably applied Strickland in rejecting William's claim.  Federal courts are bound by "state-court determinations on state-law questions" on AEDPA review, Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Bradshaw v. Richey, 546 U.S. 74, 76 (2005), and the "sufficiency of an indictment . . . is primarily a question of state law," Tapia v. Tansy, 926 F.2d 1554, 1560 (10th Cir. 1991); McKay v. Collins, 12 F.3d 66, 68 (5th Cir. 1994)

("Where the state courts have held that an indictment is sufficient under state law, a federal court need not address that issue.").  It follows, then, that since the indictment was sufficient under South Carolina law, trial counsel was not ineffective for failing to make what would have been a meritless motion.  See Freeman v. Att'y Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim."); Richardson v. Palmer, 941 F.3d 838, 857 (6th Cir. 2019) ("[D]efense counsel cannot be deemed ineffective for failing to make an argument that would have been futile.").

Williams's fourth and final objection therefore lacks merit.

## IV. CONCLUSION

After a thorough review of the record, the court adopts Magistrate Judge Cherry's report and recommendation and incorporates it herein.

It is therefore

**ORDERED** that Respondent's motion for summary judgment, docket number 11, is granted.  It is further

**ORDERED** that Williams's § 2254 petition, docket number 1, is dismissed with prejudice.  It is further

**ORDERED** that a certificate of appealability is denied because Williams has failed to make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

s/ Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
April 26, 2023

**NOTICE OF RIGHT TO APPEAL**

The Petitioner is hereby notified that he has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.